**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ANGEL HERNANDEZ,<br>Plaintiff,<br><br>v.<br><br>CITY OF SPRINGFIELD,<br>Former Springfield Police Officers,<br>STEVEN TATRO and<br>ANTHONY PIOGGIA, in their<br>individual capacities,<br>and Former Springfield<br>Police Sergeants, KEVIN DEVINE,<br>THOMAS MELEADY, and<br>TRENT DUDA, in their individual<br>capacities,<br><br>Defendants. | Civil Action No. 3:24-CV-30054-WGY |

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

Plaintiff Angel Hernandez, by and through his attorneys, Goodwin Procter LLP, alleges as follows:

**INTRODUCTION**

1. For many years, including 2008 and thereafter, the City of Springfield, the Springfield Police Department (the "SPD"), and certain police officers have deprived citizens of their constitutional rights by, among other things, fabricating, withholding, and destroying evidence, inducing false testimony, suppressing statements they were legally required to provide to the defense, deliberately failing to investigate actual perpetrators, and engaging in improperly suggestive identification procedures. The deprivation of constitutional rights was part of a

pattern and practice that developed due to a lack of training, supervision and discipline, and by deliberate misconduct by certain officers.

2. This pattern and practice of misconduct within the SPD is widely documented. On July 8, 2020, the Civil Rights Division of the United States Department of Justice ("DOJ") and the United States Attorney's Office for the District of Massachusetts issued a final report on their investigation of the SPD's Narcotics Bureau (the "DOJ Report").[1] The investigation found, among other things, that the "SPD does not have adequate systems in place to detect, address, and prevent officer misconduct."[2]

3. On April 12, 2022, the DOJ filed suit against the City of Springfield and SPD under the Violent Crime Control Law Enforcement Act of 1994 "to remedy a pattern or practice of excessive force by Springfield Police Department Narcotics Bureau officers that violates the Fourth Amendment to the Constitution of the United States."[3] The DOJ's complaint alleged, among other things, that "the SPD's deficient policies, accountability mechanisms, and training contributed to the Narcotic Bureau's pattern or practice of excessive force."[4]

4. One victim of the deprivation of his constitutional rights as a result of the SPD's constitutional violations is Angel Hernandez.

5. Plaintiff Angel Hernandez was incarcerated for more than a decade for a crime he did not commit—the fatal shooting of Alberto Rodriguez in October 2008. The shooting occurred after a confrontation involving an unknown third party or third parties outside of Mr.

---

[1] U.S. DEP'T OF JUST., INVESTIGATION OF THE SPRINGFIELD, MASSACHUSETTS POLICE DEPARTMENT'S NARCOTICS BUREAU (2020), *available at* https://www.justice.gov/opa/press-release/file/1292901/download.
[2] Id, at 22.
[3] *United States v. Springfield Police Department, et al.*, 3:22cv30043 (D. Mass. Apr. 13, 2022) (Compl. 1, ECF No. 1).
[4] *Id.* at 3.

Hernandez's store, the Pine Street Market in Springfield, Massachusetts. At the time of the shooting, Mr. Hernandez was inside his store with customers.

6. In December 2010, Mr. Hernandez was convicted of the first-degree murder of Mr. Rodriguez based solely on false eyewitness testimony induced by the SPD. There was no physical evidence linking him to the crime and the physical evidence that existed contradicted his role in any crime. Despite ample basis to do so, the SPD failed to conduct an adequate investigation of potential perpetrators of the crime.

7. Two key witnesses eventually recanted their falsely incriminating testimony, revealing that the SPD Detectives leading the investigation of Mr. Rodriguez's murder, Anthony Pioggia and Steven Tatro, had pressured, threatened, and coerced them into implicating Mr. Hernandez and his co-defendant in the crime. After the witnesses recanted their testimony and the police misconduct was revealed, Mr. Hernandez was found to have been wrongfully convicted and later acquitted of the murder in May 2021.

8. Mr. Hernandez's wrongful conviction resulted from unconstitutional conduct by Detectives Pioggia and Tatro, the callous indifference of their supervisors in the Homicide Unit at the time of the investigation, Sergeants Kevin Devine, Thomas Meleady, and Trent Duda, and from the policies, customs, and practices of the City of Springfield that caused, permitted, and emboldened Springfield police officers to violate the Constitution to obtain convictions.

9. Despite Mr. Hernandez's actual innocence, Detectives Pioggia and Tatro fabricated evidence and used improper and wrongful interrogation and identification procedures to cause Mr. Hernandez's arrest, trial, conviction, and wrongful imprisonment. They covered up this unconstitutional conduct with false and misleading statements.

10. In accordance with the custom, practice, and policy of the SPD, Sergeants Devine,

Meleady, and Duda were part of the moving force behind these violations. They failed to train Detectives Pioggia and Tatro on proper investigative techniques, actively ignored blatant inconsistencies in the investigative materials, and did not ensure that leads about potential perpetrators were factually developed. When it came to light that Detective Pioggia and Tatro intimidated witnesses into making false statements—one consequence of Sergeants Devine, Meleady, and Duda's initial failure to train and supervise their officers—they once again shirked their supervisory duties and failed to discipline Detectives Pioggia and Tatro.

11. Detective Pioggia and Tatro's police misconduct was aimed at both Mr. Hernandez and his co-defendant, Charles Wilhite, in an effort to try to develop a "joint venture" theory of the murder of Alberto Rodriguez. Mr. Hernandez's so called "joint venturer" Charles Wilhite—who was similarly exonerated of Mr. Rodriguez's murder after the coerced witness testimony was recanted and police misconduct came to light—alleges that in 2007, Detectives Pioggia and Tatro pressured, threatened, and intimidated him in an attempt to get Mr. Wilhite to sign a false statement and falsely testify that he was a witness to a murder in order to help the detectives improperly and unlawfully obtain a conviction. Mr. Wilhite refused. This unlawful police behavior, which occurred just one year before Detectives Pioggia and Tatro induced false testimony against Mr. Hernandez and Mr. Wilhite, is consistent with the unlawful pattern, practice, and policy of the City of Springfield that caused the unlawful arrest and prosecution of Mr. Hernandez.

## JURISDICTION

12. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

13. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343.

14. Venue is proper in the District of Massachusetts under U.S.C. 28 U.S.C. § 1391(b) because this is the District in which the events giving rise to the claims arose.

**PARTIES**

15. At all times relevant hereto, Plaintiff Angel Hernandez was a resident of the City of Springfield, Hampden County, Massachusetts. At the time of the arrest giving rise to this action, Mr. Hernandez was living in Springfield and was self-employed as the owner of several stores in Springfield. Presently, Mr. Hernandez is a resident of Miami-Dade County, Florida.

16. Individual Defendant Anthony Pioggia, who is sued in his individual capacity, was employed as a Detective in the SPD at the time of the events giving rise to the claims at issue. He acted under color of the laws of the Commonwealth of Massachusetts and the City of Springfield.

17. Individual Defendant Steven Tatro, who is sued in his individual capacity, was employed as a Detective in the SPD at the time of the events giving rise to the claims at issue. He acted under color of the laws of the Commonwealth of Massachusetts and the City of Springfield.

18. Individual Defendant Kevin Devine, who is sued in his individual capacity, was employed as a Sergeant in SPD's Homicide Unit at the time of the events giving rise to the claims at issue. He was responsible for the supervision and training of SPD Police Officers in the Homicide Unit, including Detectives Pioggia and Tatro, and had the ultimate responsibility for overseeing murder investigations, including the shooting of Mr. Rodriguez. He acted under color of the laws of the Commonwealth of Massachusetts and the City of Springfield.

19. Individual Defendant Thomas Meleady, who is sued in his individual capacity, was employed as a Sergeant in SPD's Homicide Unit at the time of the events giving rise to the

claims at issue. Prior to his retirement in February 2009, Sergeant Meleady was responsible for the supervision and training of SPD Police Officers in the Homicide Unit, including Detectives Pioggia and Tatro, and had the ultimate responsibility for overseeing murder investigations, including the shooting of Mr. Rodriguez. He acted under color of the laws of the Commonwealth of Massachusetts and the City of Springfield.

20. Individual Defendant Trent Duda, who is sued in his individual capacity, is the Captain of the SPD and was formerly assigned as a Sergeant in SPD's Homicide Unit from February 2009 to July 2010. During this time, then Sergeant Duda was responsible for the supervision and training of SPD Police Officers in the Homicide Unit, including Detectives Pioggia and Tatro, and had the ultimate responsibility for overseeing murder investigations, including the shooting of Mr. Rodriguez. He acted under color of the laws of the Commonwealth of Massachusetts and the City of Springfield.

21. Defendant City of Springfield is a municipal corporation under the laws of the Commonwealth of Massachusetts.

## FACTUAL ALLEGATIONS

### *The Murder of Alberto Rodriguez*

22. On October 14, 2008, Alberto Rodriguez was shot while in his vehicle outside the Pine Street Market in Springfield, Massachusetts. Physical evidence established that the shooter fired multiple shots into the car from outside the rear driver-side, including a shot through the back of the driver's seat and into Mr. Rodriquez. He died as a result of the gunshot wound.

### *The "Investigation"*

23. The investigation of Mr. Rodriguez's murder was led by Detectives Pioggia and Tatro, under the direct supervision of Sergeants Devine, Meleady, and Duda.

24. Members of the SPD interviewed individuals at the scene of the crime and were informed of a potential suspect who had been seen fleeing the Pine Street Market shortly after the shooting. Specifically, three witnesses at the scene told canvassing officers that a Hispanic male in a gray hooded sweatshirt ran from the scene after the shooting. Two of these witnesses were Maria Torres and Alma Reyes, who had been together in a car outside of the liquor store further down Pine Street at the time of the shooting. Ms. Torres was taken to the station and there she provided a written witness statement that she has seen a Hispanic male run from the scene carrying a handgun. Ms. Reyes, who also stated that she saw a potential suspect running from the scene, was never interviewed by Detectives Pioggia and Tatro. Nor was Elizabeth Lopez, the third witness who identified a Hispanic male fleeing the scene.

25. The dispatch log from the night of the murder listed an anonymous caller corroborating the witnesses' description of the potential suspect, reporting that they saw a Hispanic male in a gray hooded sweatshirt run into a nearby building with a silver handgun. Detectives Pioggia and Tatro did not take any steps to identify this anonymous caller.

26. Other witnesses interviewed shortly after the shooting signed witness statements indicating that Mr. Rodriguez was involved in an altercation with several young males outside the Pine Street Market the day before the shooting.

27. Detectives Pioggia and Tatro made no efforts to identify or find these teenagers to interview them regarding their altercation with Mr. Rodriguez the day before his murder.

28. Detective Pioggia and Tatro's supervisors at the time of the murder, Sergeants Devine and Meleady, were responsible for reviewing investigative materials such as the witness statements and dispatch log and failed to ensure that Detectives Pioggia and Tatro interviewed Ms. Reyes, Ms. Lopez, and the anonymous caller to appropriately develop evidence about a

potential suspect.

29. Despite the multiple witness statements at the crime scene detailing a Hispanic male fleeing the crime scene with a gun, the SPD instead targeted their investigation on Mr. Hernandez, who owned the Pine Street Market.

30. On the night of Mr. Rodriguez's murder, Mr. Hernandez was approached by and questioned by Sergeant Devine. He cooperated with the SPD and executed two statements during his interrogation at the police station.

31. He was in the Pine Street Market helping customers when he heard gunshots outside, did not himself own a gun, and did not have any involvement with Mr. Rodriguez's murder.

32. Mr. Hernandez voluntarily signed a Search Warrant Waiver Form, allowing the SPD to search the Pine Street Market on the night of the murder. No evidence of criminal activity was located.

33. Mr. Hernandez also consented to a gunshot residue ("GSR") test by the SPD on his hands on the night of the shooting. The results of Mr. Hernandez's GSR test were negative.

34. The SPD ordered GSR testing to be performed on Tyrell Campbell on the same night. Mr. Campbell was in the neighborhood on the night of the shooting and gave a statement to the SPD. He tested positive for GSR on the front and back of his hands.

35. Mr. Campbell's written statement to the SPD on the night of the murder does not address why he would test positive for GSR and no other investigative reports suggest that Detectives Pioggia and Tatro interviewed Mr. Campbell about this topic. Sergeants Devine and Meleady actively ignored that this fact went uninvestigated by the lead detectives.

36. At Mr. Wilhite's new trial in 2013, Mr. Campbell testified that he was picked up

by the SPD for a second time on October 16, 2008 and spoke with an officer for at least an hour. The SPD did not memorialize Mr. Campbell's second statement in a witness statement or investigative report.

37. Mr. Campell stated that he gave a description to the SPD officer of a heavy-set Black male over six feet getting into a gray car and speeding away after the shooting. No further investigation was undertaken by Detectives Pioggia and Tatro regarding the person Mr. Campbell stated he saw speeding away from the scene of the crime.

38. In the months following the shooting, a confidential informant told Detective Pioggia that he knew the identity of the shooter by nickname and identified the individual—who was not Mr. Hernandez—from a photo array. A second confidential informant later corroborated this identification and told Detective Pioggia that the identified suspect's name was Abinel Zayas.

39. In June 2009, Detectives Pioggia and Tatro interviewed Mr. Zayas about his whereabouts on the night of the murder.

40. While Mr. Zayas denied running away from the scene of the murder with a gun and stated that he did not know who was responsible for the shooting, he confirmed that on the night of the murder he was walking towards the Pine Street Market with a friend, Weldin Irazzary, when he heard gunshots.

41. Detectives Pioggia and Tatro made no further efforts to investigate Mr. Zayas's potential involvement in the murder, and did not even interview Mr. Irazzary to confirm Mr. Zayas's account of the night of the murder.

42. Detective Pioggia and Tatro's supervisors at this time in the investigation, Sergeants Devine and Duda, were aware that Mr. Zayas was a prime suspect in the murder of

Mr. Rodriguez and failed to ensure that Detectives Pioggia and Tatro took any steps to corroborate his alibi on the night of the shooting.

43. Mr. Zayas also described seeing a Black male speeding off from the scene in a dark colored vehicle. While Mr. Zayas' recollection conformed with that of Mr. Campbell, Detectives Pioggia and Tatro took no steps to identify the driver of the car described to have fled the scene after the shooting.

***Creating the Story***

44. As a result of being "unable" to identify the shooter and close the case, Detectives Pioggia and Tatro—despite the lack of any physical evidence to support their theory—created their own story: that Mr. Hernandez handed Charles Wilhite, a Black male, a gun and Mr. Wilhite murdered Mr. Rodriguez with that weapon. That story was false and the police knew it. There was never a joint venture between Mr. Hernandez and Mr. Wilhite at any time, and Mr. Hernandez spent over a decade in prison for a crime he did not commit. Rightfully, Mr. Hernandez and Mr. Wilhite have each been exonerated of the criminal charge.

***Falsified Witness Testimony***

**<u>Giselle Albelo</u>**

45. On November 5, 2008, after interrogation at the police station, Giselle Albelo adopted a false statement written by Detectives Pioggia and Tatro in which they claimed that she had been at the Pine Street Market at the time of the shooting and heard Mr. Hernandez identify the victim to the shooter. Ms. Albelo adopted Detectives Pioggia and Tatro's construction that Ms. Albelo saw a Black male shoot at Mr. Rodriguez, after which Mr. Rodriguez went to his car and drove away while the Black male continued to fire shots at the vehicle.

46. Despite having the equipment to do so, the SPD did not disclose any audio or video recording of Detectives Pioggia and Tatro's interrogation of Ms. Albelo.

47. Ms. Albelo's statement was demonstrably false, as the detectives knew. In fact, at Mr. Hernandez's first trial, Ms. Albelo testified that she told Detectives Pioggia and Tatro when they picked her up for an interrogation that she was not in the Pine Street Market at the time of the shooting. Detectives Pioggia and Tatro threatened and intimidated Ms. Albelo in order to get her to say that she had witnessed the shooting.

48. Not only did Ms. Albelo tell the officers she was not in the Pine Street Market on the night of the shooting, but the forensic evidence from the crime scene was conclusive and it showed that Mr. Rodriguez was shot at when he was inside his vehicle. This physical evidence is contrary to the statement induced from Ms. Albelo by Detectives Pioggia and Tatro, which stated that Mr. Rodriguez was shot outside his vehicle in front of Mr. Hernandez's store.

49. During her interrogation, Detectives Pioggia and Tatro also showed Ms. Albelo photographs of eight Black males. After improper identification techniques, Ms. Albelo selected Mr. Wilhite's picture as the man that Mr. Hernandez allegedly interacted with on the night of the murder.

50. Ms. Albelo's identification of Mr. Wilhite was the result of unlawful police pressure and intimidation and was factually contradicted by other evidence. Any reasonable police officer would have known that her statement was unreliable.

51. After testifying before the grand jury on October 22, 2009, Ms. Albelo recanted her false statement in a sworn affidavit dated November 3, 2009. Ms. Albelo admitted that she had not witnessed the crime and, in truth, she had been home at the time of the shooting. Several witnesses corroborated that Ms. Albelo was at her apartment building at the time of the shooting. She explained her false statement as due to being "in fear [of] and [feeling] extreme pressure from [the] police to provide certain details."

52. Detective Pioggia and Tatro's supervisors at the time of Ms. Albelo's recantation, Sergeants Devine and Duda, did not investigate or discipline Detective Pioggia and Tatro for their improper interrogation and intimidation of Ms. Albelo.

**Patryce Archie**

53. On October 16, 2008, two days after the shooting, Patryce Archie told Detective James Goldrick of the SPD that she had been inside the Pine Street Market at the time of the shooting, but she did not see what happened outside. She stated that she was in the Pine Street Market joking with Mr. Hernandez when they heard gunshots outside. Ms. Archie stated that she dropped to the floor with the another customer and after the gunshots stopped, she looked up and saw Mr. Hernandez exiting the store. She stated that Mr. Hernandez came back into the store a few seconds later and stated that he did not know what was happening outside.

54. On November 6, 2008, the day after Giselle Albelo was induced by Detectives Pioggia and Tatro to sign a false statement that she witnessed the shooting, Ms. Archie spoke to the SPD for the second time. However, this time she was interrogated by Detectives Pioggia and Tatro.

55. Ms. Archie's second statement to the SPD changed drastically from the first statement that she gave shortly after the murder. Ms. Archie now stated that she was inside the Pine Street Market on the night of the murder and witnessed Mr. Hernandez retrieve a gun from a shelf of cereal boxes and run out of the store before she heard gunshots.

56. Detective Pioggia and Tatro's supervisors at the time of Ms. Archie's second statement, Sergeants Devine and Meleady, did not question the reliability—or timing—of her new account about the night of the murder.

57. Ms. Archie also stated for the first time that she remembered seeing a young man

wearing a gray hooded sweatshirt outside the Pine Street Market before and after the shooting. Detectives Pioggia and Tatro, in their effort to bolster the false "joint venture" murder theory, showed Ms. Archie various photographs of Black men, but she said that she could not identify, in those photographs, the person she had seen outside the store. The detectives continued to use unduly suggestive procedures to select Mr. Wilhite's picture in order to strengthen their false joint venture theory. This included having Ms. Archie repeatedly view photos until she selected a photograph of Mr. Wilhite, even after she told the detectives she was not able to identify anyone. The Detectives continued to press Ms. Archie to look through photos and she eventually selected Mr. Wilhite's picture but said "[she] didn't know if that's him or not." However, Ms. Archie's statement, written by Detectives Pioggia and Tatro, said that "this guy may have been the guy that was out in front of the store when I went in…with the gray hoodie on."

58. Ms. Archie's new statement was misleading and materially misrepresented the identification procedure and how her false version was procured by the police. The statement failed to reveal that Detectives Pioggia and Tatro caused Ms. Archie to look through the photos repeatedly until she selected a picture. The police covered up their misconduct by having Ms. Archie overstate the identification of Mr. Wilhite—failing to disclose that she never saw the Black man's entire face. The statement did not thoroughly disclose that Ms. Archie told Defendants Pioggia and Tatro "I don't know if that's him [Mr. Wilhite] or not" and that she was only selecting the photograph because "the lips looked familiar" to her. Eventually, Ms. Archie was viewing photos that covered all but the lips and noses in the pictures.

59. Despite the ability to do so, the SPD does not have any audio or video recordings of the interrogations of Ms. Archie.

**Maria Torres**

60. At times between January and March 2009, Detectives Tatro and Pioggia interviewed Maria Torres, a witness at the crime scene on the night of the murder. She repeatedly said that the person she saw running from the scene was a light-skinned Hispanic male. She stated that the light-skinned Hispanic male had what appeared to be a gun in his hand and he yelled "I robbed him" as he ran away.

61. Detectives Tatro and Pioggia showed Ms. Torres photo arrays and she failed multiple times to identify anyone as the light-skinned Hispanic male she saw fleeing the scene of the crime.

62. Ms. Torres also stated there was a Black man on the corner who was clapping as the Hispanic male ran away from the scene. Deceives Tatro and Pioggia did not investigate who the Black male was clapping at the shooting.

63. On March 11, 2009, Detective Pioggia interviewed Ms. Torres and showed her at least two photo arrays, one of Hispanic males and another of Black males. Ms. Torres did not identify anyone as the person she had seen running from the scene of the crime with a gun.

64. After Ms. Torres said she was unable to identify anyone, Detective Pioggia asked her to select a picture based on the "skin tone" of the person she had seen running with a gun. Ms. Torres selected a light-skinned Hispanic male from the array of Hispanic males. She selected the picture only for the skin tone, not to identify the person pictured.

65. Despite the nature of this "selection," Detective Pioggia asked Ms. Torres to again review the photos of Black males and consider whether it was possible the person she saw running was Black. Ms. Torres said it was possible and she selected a photograph from the array of Black males based on skin tone. The second photograph she selected was a light-skinned

Black male.

66. Ms. Torres did not identify either Mr. Hernandez or Mr. Wilhite.

67. After Ms. Torres had picked two photographs, Detective Pioggia pressured her to continue reviewing the pictures of Black males to determine whether anyone else's skin tone was "close." Ms. Torres did not identify anyone from the array and repeated to Detective Pioggia that the person she had seen with the gun was a "light-skinned" Hispanic male. Ultimately, she was induced to "identify" Mr. Wilhite as having a similar "skin tone" as the man running from the scene.

68. Despite the ability to do so, the SPD does not have any audio or video recordings of the interrogations of Ms. Torres.

69. Detective Pioggia prepared an Investigative Report of his interrogation of Ms. Torres that failed to disclose police misconduct leading to the "identification." Detective Pioggia failed to disclose that Ms. Torres was asked to keep looking through the photos despite having already selected pictures of an individual other than Mr. Wilhite and that, finally, Ms. Torres was asked to select pictures just based on skin tone.

70. Any reasonable police officer with proper training and supervision would have known that it is improperly suggestive to push a witness to continue selecting photos until she identifies the individual the police want identified. Since this violates fundamental standards of eyewitness identification and interrogation (adopted by Massachusetts courts and federal law enforcement) that are designed to prevent false and unreliable witness identification and statements, any reasonable police officer would have known this procedure was unlawful. Thereafter, covering up such misconduct, by creating a misleading sworn "witness" statement and a misleading police report, was unlawful concealment.

**Anthony Martinez**

71. Almost a year after the murder, despite the false statements they were able to induce from "eyewitnesses," Detectives Pioggia and Tatro still did not have enough evidence to bring criminal charges against Mr. Hernandez and Mr. Wilhite.

72. In July 2009, Anthony Martinez, who had been living near the Pine Street Market at the time of the shooting, was arrested for armed robbery. Detectives Pioggia and Tatro interviewed Mr. Martinez while he was in custody on September 17, 2009.

73. Detectives Pioggia and Tatro had talked to Mr. Martinez twice before this interrogation, including a day or two after the murder at his place of work. Both times Mr. Martinez told the officers that he did not know anything about Mr. Rodriguez's murder. Detectives Pioggia and Tatro did not produce any reports documenting these interactions or Mr. Martinez's statements denying any knowledge of the murder.

74. However, when Detectives Pioggia and Tatro interrogated Mr. Martinez in custody, they knew that he sought favorable treatment on criminal charges in exchange for testimony that incriminated Mr. Hernandez and Mr. Wilhite. As a result, Mr. Martinez was induced to sign a statement in which he falsely claimed to have been at the Pine Street Market on the night of the murder and seen Mr. Hernandez hand Mr. Wilhite a gun.

75. Mr. Martinez's statement was contrary to other witness statements that Detectives Pioggia and Tatro had already obtained and was plainly false, including about who was working at the market and who was shopping inside the market that night. In addition, witnesses—including those who were inside the market on the night of the murder—contradicted Mr. Martinez being in the market.

76. Detectives Pioggia and Tatro did not take any steps to verify the credibility of Mr.

Martinez's statement, such as asking Giselle Albelo and Patryce Archie whether they recalled Mr. Martinez as being in the Pine Street Market that night.

77. Notably, the written statement Ms. Albelo gave to Detectives Pioggia and Tatro mentions that she saw Mr. Martinez after the shooting in their apartment building. Ms. Albelo therefore clearly knew who Anthony Martinez was and clearly did not see him in the store at the time of the shooting.

78. Any reasonable police officer, including Detective Pioggia and Tatro's supervisors at the time, Sergeants Devine and Duda, would have known that Mr. Martinez's statement was false and that he was not a reliable or credible witness.

79. Indeed, Mr. Martinez's girlfriend, Chelsea Ortiz, signed an affidavit on August 16, 2012 stating that Mr. Martinez was with her—not in the market—before and during the murder. Ms. Ortiz stated that she was questioned by two SPD detectives "on numerous occasions" after the shooting and that she answered their questions consistent with the information in her signed affidavit. Similar to their first two interactions with Mr. Martinez, Detectives Pioggia and Tatro did not produce any reports documenting these interactions or Ms. Oritz's statements.

80. Jessica Gonzalez, a friend of Mr. Martinez and Ms. Ortiz, signed an affidavit corroborating that Mr. Martinez was in Ms. Ortiz's apartment with her and Ms. Ortiz when the shooting occurred. She also stated that immediately after the shooting, she saw Giselle Aleblo looking out the window of the apartment building. Ms. Gonzalez stated that she was questioned by two SPD detectives "on many occasions" after the shooting and that she answered their questions consistent with the information in her signed affidavit. Detectives Pioggia and Tatro did not produce any reports documenting these interactions or Ms. Gonzalez's statements.

81. On December 13, 2012, Ms. Ortiz gave a statement to the SPD regarding Mr. Martinez's whereabouts at the time of the murder. This statement, taken after the conviction of Mr. Hernandez and Mr. Wilhite, was recorded as it was obtained by a Springfield police officer who was not leading the investigation of Mr. Rodriguez's murder. Meanwhile, Detectives Pioggia and Tatro, who were instead attempting to create a false narrative with their "witness interviews," did not audio or video record their jailhouse interview with Mr. Martinez.

82. On September 17, 2009—the same afternoon that Detectives Pioggia and Tatro induced Mr. Martinez's false statement that he saw Mr. Hernandez hand a Black man a gun—Detective Pioggia applied for arrest warrants charging Mr. Hernandez and Mr. Wilhite in connection with the murder of Mr. Rodriguez.

83. Despite the glaring inconsistencies in key witnesses statements, no physical evidence tying Mr. Hernandez and Mr. Wilhite to the crime, and leads such as potential witnesses and suspects that were actively ignored throughout the investigation, the SPD arrested Mr. Wilhite and Mr. Hernandez in connection with Mr. Rodriguez's murder.

84. These arrests were sanctioned by Sergeants Devine, Meleady, and Duda, all of whom supervised Detectives Pioggia and Tatro, all of whom reviewed Detectives Pioggia and Tatro's investigative files and status reports, and all of whom shared the ultimate responsibility to oversee the proper investigation of Mr. Rodriguez's murder.

85. On October 22, 2009, the Hampden County District Attorney's office presented the case against Mr. Hernandez and Mr. Wilhite to the grand jury. The prosecutor presented the evidence by calling the witnesses who had provided statements to the SPD. There was no other evidence implicating Mr. Hernandez in the murder.

86. That same day, the grand jury returned an indictment against Mr. Hernandez and

Mr. Wilhite for first degree murder.

**Nathan Perez**

87. After the indictment, and in an apparent effort to rehabilitate their case after Ms. Albelo recanted her sworn statement implicating Mr. Hernandez and Mr. Wilhite in the murder, Detectives Pioggia and Tatro continued to create false testimony in preparation of the trial. This continued misconduct was allowed to happen due to the fact Sergeants Devine and Meleady never investigated or disciplined Detectives Pioggia and Tatro after they intimated Ms. Albelo into give a false statement.

88. Detective Pioggia and another SPD officer interviewed Nathan Perez in jail on March 10, 2010. Mr. Perez lived near the Pine Street Market when Mr. Rodriguez was killed. Mr. Perez had recently been arrested and was facing various criminal charges at the time he was visited by Detective Pioggia. In a January 19, 2010 daily activity log reviewed by his supervisors at the time, Sergeants Devine and Duda, Detective Pioggia confirmed that Mr. Perez was being held without bail. He wrote: "Will wait another week to see him so the jail experience set in and maybe he'll cooperate in the Alberto Rodriguez murder."

89. In the March 10, 2010 interrogation, Mr. Perez told Detective Pioggia that he had been near the Pine Street Market at the time of the shooting and had picked up shell casings off the ground after the shooting. He told Detective Pioggia that he could not identify the murderer from a photo array. Detective Pioggia told Mr. Perez that he would be charged with being an accessory after the fact to murder if Mr. Perez could not identify the shooter. Detective Pioggia also indicated to Mr. Perez that his pending criminal charges would be dropped if he cooperated with police. Mr. Perez repeated that he could not identify the shooter. This interrogation of Mr. Perez was not memorialized in a police report, witness statement, photo array form, or recording.

90. On April 7, 2010, Detective Pioggia again interrogated Mr. Perez in jail. Mr. Perez testified at an evidentiary hearing on April 9, 2012 that he told Detectives Pioggia and Tatro during this interrogation that he was in the store on the night of the murder, but he did not see anything. Detective Pioggia told Mr. Perez that if he kept "lying," he would be charged with accessory after the fact to murder.

91. During this interrogation, Detectives Pioggia and Tatro showed Mr. Perez a single photograph of Mr. Wilhite. Mr. Perez denied knowing Mr. Wilhite. Detective Pioggia again told Mr. Perez that if he did not identify Mr. Wilhite as the shooter, who according to the SPD allegedly received a weapon from Mr. Hernandez, Mr. Perez would be charged with accessory after the fact to murder. Detective Pioggia again indicated that Mr. Perez's pending criminal charges would be dropped if he cooperated in making the requested statement to police.

92. To corroborate Mr. Perez's statement that he was allegedly inside the Pine Street Market at the time of the murder with a Black woman and a Hispanic woman, Detectives Pioggia and Tatro showed Mr. Perez single photographs of Patryce Archie and Giselle Albelo. He identified them as being in the store. Ms. Albelo was, in fact, in her home at the time of the murder. Any reasonable police officer would have known that Mr. Perez's statement was false and that he was not a reliable or credible witness.

93. At the end of this interrogation, Mr. Perez agreed to incriminate Mr. Hernandez and Mr. Wilhite in exchange for immunity from an accessory to murder charge and for a favorable result as to his pending the criminal charges.

94. Sergeants Devine and Duda never questioned the veracity of Mr. Perez's statement or his credibility as a witness.

***The Trial***

95. Mr. Hernandez and Mr. Wilhite's trial before a jury in Hampden County Superior Court began on November 16, 2010. The only incriminating evidence presented against Mr. Hernandez was testimony of the alleged eyewitnesses from whom Detectives Pioggia and Tatro had induced false statements.

96. Mr. Hernandez and Mr. Wilhite were convicted of murder in the first degree on December 7, 2010. Mr. Hernandez was sentenced to life in prison without the possibility of parole.

***Recantations and Perjury Convictions***

97. On August 17, 2011, Mr. Perez signed an affidavit recanting his statement to the SPD and his trial testimony. He detailed that coercion by Detectives Pioggia and Tatro caused him to falsely testify that Mr. Wilhite received a weapon from Mr. Hernandez on the night of the murder. Mr. Perez stated that "he felt under pressure" not to make changes to his written statement and by doing so, he gave "false and misleading testimony at trial."

98. Mr. Perez's sworn statement says, "[T]he two Detectives showed me the photo of Charles Wilhite . . . as a single photo – and not with other photos" and "Detective (Pioggi) [*sic*] wrote 'shooter' under the photo and told me to initial it. This is sort of how the interview went where they were giving information to agree to." This was improper and unlawful so Detective Pioggia later attempted to cover it up.

99. On April 9-10, 2012, Justice Velis of the Hampden District Court held a hearing in which Mr. Perez testified that he falsely incriminated Mr. Hernandez and Mr. Wilhite due to improper police conduct. He also testified that he did not see Mr. Hernandez hand a gun to someone and that was a false statement.

100. At the same hearing, Detective Pioggia testified untruthfully, denying that he had engaged in the misconduct described. Justice Velis found that Mr. Perez did feel improper pressure from the SPD. Justice Velis explicitly did not credit Detective Pioggia's testimony about the interrogation of Mr. Perez calling Detective Pioggia's testimony "implausible" and that it "strain[ed] credulity." In essence, Judge Velis found Detective Pioggia lied to cover up the unlawful police conduct.

101. Judge Velis also found that Detective Pioggia would have motive to improperly intimidate Mr. Perez, as the only other person to identify the shooter was Giselle Albelo, who had recanted her statement by the time Detective Pioggia interviewed Mr. Perez in custody.

102. Detective Pioggia's supervisors at the time of Judge Velis's findings, Sergeants Devine and Duda, did not investigate or discipline Detective Pioggia for his improper interrogation and intimidation of Mr. Perez, nor was he disciplined for giving untruthful testimony at the evidentiary hearing.

## DAMAGES

103. Before Mr. Hernandez was wrongfully imprisoned, he was a successful businessperson in the Springfield community and worked hard to establish a stable home for his children. He worked tireless hours to save up for his children's future college education, even acquiring a computer technician degree while working fulltime at his grocery and electronics stores.

104. The eleven years that Mr. Hernandez wrongfully spent in prison deprived him of irreplaceable moments, including his children's birthdays, graduations, and holiday celebrations that he will never get back. He also missed the final years of his beloved mother's life.

105. In addition to losing his liberty, peace of mind, and interactions with his friends

and family, Mr. Hernandez lost possession of valuable properties and businesses while he was incarcerated. Once a successful business owner and landlord, Mr. Hernandez is now financially supported by loved ones. He is unable to afford even basic medical care. He works two low-paying hourly wage jobs, both of which involve hard labor and are insufficient to keep up with the everyday cost of living.

## CLAIMS

## COUNT I

### 42 U.S.C. § 1983 *Monell* Claim Against the City of Springfield

106. Plaintiff hereby incorporates by reference all the foregoing paragraphs as if restated fully herein.

107. Mr. Hernandez's injuries were caused by the official policies of Defendant City of Springfield and the Springfield Police Department, by the practices and customs of Defendant City of Springfield and the Springfield Police Department, as well as by the actions of final policymaking officials for Defendant City of Springfield and the Springfield Police Department.

108. At all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Springfield promulgated written or unwritten rules, regulations, policies, and procedures governing witness interviews, preparation and presentation of witness testimony, and disclosure of investigative materials and evidence.

109. Defendant City of Springfield was also responsible for the supervision, training, and discipline of employees of the City of Springfield, including employees of the Springfield Police Department.

110. These rules, regulations, policies, and procedures were implemented by employees of Defendant City of Springfield, including the individual Defendants, who were responsible for conducting investigations of crimes in and around Springfield, Massachusetts.

111. In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Springfield had notice of a widespread practice by its officers and employees under which individuals suspected of criminal activity, such as Mr. Hernandez, were routinely deprived of exculpatory evidence, were subjected to criminal proceedings based on false evidence, and were deprived of their liberty without probable cause, such that individuals were routinely implicated in crimes to which they had no connection and for which there was scant evidence to suggest that they were involved.

112. These widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of Defendant City of Springfield directly encouraged and were the moving force behind the type of misconduct at issue in this Complaint by failing to adequately supervise and train their officers and employees who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful prosecutions and convictions.

113. The above-described widespread practices, which were so well settled as to constitute the *de facto* policy of the City of Springfield, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

114. The policies and practices described herein deprived Mr. Hernandez of his well established constitutional right to be free from arrest without probable cause and to be free from an unreasonable seizure of his person under the Fourth Amendment to the United States

Constitution as applied under the Fourth Amendment and his right to due process of law under the Fourth Amendment.

115. Mr. Hernandez's injuries were caused by officers and employees of the Defendant City of Springfield and the Springfield Police Department, including but not limited to the individually named Defendants, who acted pursuant to the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT II

**Against Anthony Pioggia**
**42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments**

116. Plaintiff hereby incorporates by reference all the foregoing paragraphs as if restated fully herein.

117. Individual Defendant Pioggia, acting individually and in concert with others, deprived Mr. Hernandez of his clearly established constitutional right, under the Fourth and Fourteenth Amendments of the United States Constitution, to a fair trial.

118. Individual Defendant Pioggia deprived Mr. Hernandez of his right to a fair trial by fabricating inculpatory evidence by intimidating witnesses to make false statements implicating him in the murder of Mr. Rodriguez.

119. Individual Defendant Pioggia drafted knowingly false and misleading witness statements and investigative reports to conceal his improper investigative tactics.

120. Individual Defendant Pioggia ignored obvious inconsistencies in witness statements that would have alerted any reasonable police officer to the fact that the alleged eyewitnesses were not providing reliable evidence.

121. Individual Defendant Pioggia failed to properly document his investigation of Mr. Rodriguez's murder, including interactions with witnesses whose statements were critical to Mr. Hernandez's defense.

122. Individual Defendant Pioggia failed to investigate potential perpetrators and clear alternative theories about the murder of Mr. Rodriguez.

123. Individual Defendant Pioggia maliciously prosecuted Mr. Hernandez, depriving him of his well-established constitutional right to be free from arrest without probable cause and to be free from an unreasonable seizure of his person under the Fourth Amendment to the United States Constitution as applied under the Fourteenth Amendment and his right to due process of law under the Fourteenth Amendment.

124. As a direct and proximate result of Individual Defendant Pioggia's actions, Mr. Hernandez was wrongfully incarcerated for over eleven years.

## COUNT III

**Against Steven Tatro**
**42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments**

125. Plaintiff hereby incorporates by reference all the foregoing paragraphs as if restated fully herein.

126. Individual Defendant Tatro, acting individually and in concert with others, deprived Mr. Hernandez of his clearly established constitutional right, under the Fourth and Fourteenth Amendments of the United States Constitution, to a fair trial.

127. Individual Defendant Tatro deprived Mr. Hernandez of his right to a fair trial by fabricating inculpatory evidence by intimidating witnesses to make false statements implicating him in the murder of Mr. Rodriguez.

128. Individual Defendant Tatro drafted knowingly false and misleading witness statements and investigative reports to conceal his improper investigative tactics.

129. Individual Defendant Tatro ignored obvious inconsistencies in witness statements that would have alerted any reasonable police officer to the fact that the alleged eyewitnesses were not providing reliable evidence.

130. Individual Defendant Tatro failed to properly document his investigation of Mr. Rodriguez's murder, including interactions with witnesses who statements were critical to Mr. Hernandez's defense.

131. Individual Defendant Tatro failed to investigate potential perpetrators and clear alternative theories about the murder of Mr. Rodriguez.

132. Individual Defendant Tatro maliciously prosecuted Mr. Hernandez, depriving him of his well-established constitutional right to be free from arrest without probable cause and to be free from an unreasonable seizure of his person under the Fourth Amendment to the United States Constitution as applied under the Fourteenth Amendment and his right to due process of law under the Fourteenth Amendment.

133. As a direct and proximate result of Individual Defendant Tatro's actions, Mr. Hernandez was wrongfully incarcerated for over eleven years.

## COUNT IV

**Against Kevin Devine**
**42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments**

134. Plaintiff hereby incorporates by reference all the foregoing paragraphs as if restated fully herein.

135. A supervisor may be found liable under section 1983 if the "supervisor's conduct or inaction amounted to a reckless or callous indifference to the constitutional rights of others."

*Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 562 (1st Cir. 1989). Such reckless or callous indifference is evident "when it would be manifest to any reasonable official that his conduct was very likely to violate in individual's constitutional rights." *Id.*

136. The false arrest, malicious prosecution, wrongful conviction, and prolonged confinement of Mr. Hernandez was caused by Individual Defendant Devine, acting in his individual capacity, who, with deliberate indifference to the rights of criminal suspects, failed adequately to train and/or supervise Detectives Pioggia and Tatro in proper investigative techniques. In so doing, Individual Defendant Devine tacitly acquiesced in, condoned and/or encouraged Detectives Pioggia and Tatro to engage in unconstitutional misconduct.

137. Individual Defendant Devine, by deliberately and/or recklessly failing to train and supervise his subordinate officers, caused his subordinates to deprive Mr. Hernandez of his clearly established constitutional rights, including but not limited to, his right to be free from deprivation of liberty without due process of law, his right to a fair trial, and his right to be free from unreasonable searches and seizures.

138. Moreover, Individual Defendant Devine allowed his subordinates to act with impunity in an environment in which those subordinates were not supervised, disciplined, or trained, and which those subordinates knew that their violations of Plaintiff's constitutional rights would be facilitated, approved, and/or condoned by their supervisors.

139. As a direct and proximate result of Individual Defendant Devine's callous indifference to Detective Pioggia and Tatro's violation of Mr. Hernandez's constitutional rights, Mr. Hernandez was wrongly incarcerated for over eleven years.

## COUNT V

**Against Thomas Meleady**
**42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments**

140. Plaintiff hereby incorporates by reference all the foregoing paragraphs as if restated fully herein.

141. The false arrest, malicious prosecution, wrongful conviction, and prolonged confinement of Mr. Hernandez was caused by Individual Defendant Meleady, acting in his individual capacity, who, with deliberate indifference to the rights of criminal suspects, failed adequately to train and/or supervise Detectives Pioggia and Tatro in proper investigative techniques. In so doing, Individual Defendant Meleady tacitly acquiesced in, condoned and/or encouraged Detectives Pioggia and Tatro to engage in unconstitutional misconduct.

142. Individual Defendant Meleady, by deliberately and/or recklessly failing to train and supervise his subordinate officers, caused his subordinates to deprive Mr. Hernandez of his clearly established constitutional rights, including but not limited to, his right to be free from deprivation of liberty without due process of law, his right to a fair trial, and his right to be free from unreasonable searches and seizures.

143. Moreover, Individual Defendant Meleady allowed his subordinates to act with impunity in an environment in which those subordinates were not supervised, disciplined, or trained, and which those subordinates knew that their violations of Plaintiff's constitutional rights would be facilitated, approved, and/or condoned by their supervisors.

144. As a direct and proximate result of Individual Defendant Meleady's callous indifference to Detective Pioggia and Tatro's violation of Mr. Hernandez's constitutional rights, Mr. Hernandez was wrongly incarcerated for over eleven years.

## COUNT VI

**Against Trent Duda**
**42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments**

145. Plaintiff hereby incorporates by reference all the foregoing paragraphs as if restated fully herein.

146. The false arrest, malicious prosecution, wrongful conviction, and prolonged confinement of Mr. Hernandez was caused by Individual Defendant Duda, acting in his individual capacity, who, with deliberate indifference to the rights of criminal suspects, failed adequately to train and/or supervise Detectives Pioggia and Tatro in proper investigative techniques. In so doing, Individual Defendant Duda tacitly acquiesced in, condoned and/or encouraged Detectives Pioggia and Tatro to engage in unconstitutional misconduct.

147. Individual Defendant Dida, by deliberately and/or recklessly failing to train and supervise his subordinate officers, caused his subordinates to deprive Mr. Hernandez of his clearly established constitutional rights, including but not limited to, his right to be free from deprivation of liberty without due process of law, his right to a fair trial, and his right to be free from unreasonable searches and seizures.

148. Moreover, Individual Defendant Duda allowed his subordinates to act with impunity in an environment in which those subordinates were not supervised, disciplined, or trained, and which those subordinates knew that their violations of Plaintiff's constitutional rights would be facilitated, approved, and/or condoned by their supervisors.

149. As a direct and proximate result of Individual Defendant Duda's callous indifference to Detective Pioggia and Tatro's violation of Mr. Hernandez's constitutional rights, Mr. Hernandez was wrongly incarcerated for over eleven years.

## PRAYERS FOR RELIEF

**WHEREFORE**, Plaintiff Angel Hernandez demands judgment jointly and severally against Defendants as follows:

a. That the Court award compensatory damages to him and against the Defendants, jointly and severally, in an amount to be determined at trial;

b. For pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

c. For any and all such other relief to which he may be entitled.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury on all issues and claims set forth in this First Amended Complaint, pursuant to the Seventh Amendment of the United States Constitution and Fed. R. Civ. P. 38(b).

Dated this 24th day of May, 2024.

Respectfully submitted,

ANGEL HERNANDEZ,

By his attorneys,

*/s/ Joseph F. Savage, Jr.*

Joseph F. Savage, Jr.
BBO #443030
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Phone: (617) 570-1000
Fax: (617) 523-1231

Todd J. Marabella
BBO #682525
GOODWIN PROCTER LLP

100 Northern Avenue
Boston, MA 02210
Phone: (617) 570-1000
Fax: (617) 523-1231

Ashton L. O'Halloran
*Pro Hac Vice Forthcoming*
GOODWIN PROCTER LLP
Three Embarcadero Center
San Francisco, CA 94111
Phone: (415) 733-6000
Fax: (415) 677-9041

Kathleen R. Callahan
BBO #710807
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Phone: (617) 570-1000
Fax: (617) 523-1231

Caitlin M. Donovan
BBO #710919
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Phone: (617) 570-1000
Fax: (617) 523-1231

## CERTIFICATE OF SERVICE

I hereby certify that on May 24, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF system, which sent notification of filing to all attorneys of record.

*/s/ Joseph F. Savage, Jr.*
Joseph F. Savage, Jr.