UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANGEL HERNANDEZ, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | )     Civil No. 3:24-cv-30054 |
| | ) |
| CITY OF SPRINGFIELD, Former Springfield | ) |
| Police Officers STEVEN TATRO and ANTHONY | ) |
| PIOGGIA, in their individual capacities, and | ) |
| Former Springfield Police Sergeants KEVIN | ) |
| DEVINE, THOMAS MELEADY, and | ) |
| TRENT DUDA, in their individual capacities, | ) |
| | ) |
| Defendants. | ) |

MEMORANDUM AND ORDER ON NON-PARTY
DOMENIC SARNO'SMOTION TO QUASH SUBPOENA
AND MOTION FOR A PROTECTIVE ORDER
[Docket. No. 90]

Boal, M.J.

Pursuant to Rules 26(c) and 45(d)(3) of the Federal Rules of Civil Procedure, non-party

Domenic Sarno, the Mayor of Springfield, moves to quash a deposition subpoena served by

plaintiff Angel Hernandez and requests a protective order.  Docket No. 90.  For the following

reasons, the motion is denied.[1]

  I.   Background

On October 14, 2008, Alberto Rodriguez was killed while sitting in his vehicle outside

the Pine Street Market in Springfield, Massachusetts.  Docket No. 21 ¶ 22.  Forensic evidence

indicated that the gunman fired multiple shots from outside the rear driver-side of the vehicle,

---

[1] On February 27, 2026, the parties consented to jurisdiction by the undersigned magistrate
judge.  Docket No. 124.

1

including a shot that traveled through the back of the driver's seat, killing Rodriguez.  Id.  When interviewed by Springfield Police Department ("SPD") officers, plaintiff Angel Hernandez, the owner of Pine Street Market, stated that he was inside his shop helping customers when the shooting happened, and that he did not own a gun.  Id. ¶¶ 29, 31.  Despite this and other alleged evidence, including a negative gunshot residue test and the existence of another potential suspect, Hernandez claims that the defendant officers focused their investigation on him and engaged in misconduct, including eliciting false witness testimony and fabricating evidence, all leading to his wrongful arrest, conviction, and eleven-year imprisonment.  Id. ¶¶ 5-11, 33-44.

On April 17, 2024, Hernandez filed his first complaint against the City of Springfield and several former Springfield police officers (collectively "Defendants"), which he later amended on May 24, 2024.  Docket Nos. 1, 21.  In addition to alleging misconduct by the Defendant police officers, Hernandez claims that, in violation of 42 U.S.C. § 1983, the City and SPD caused his injuries by failing to train, supervise, or discipline officers for misconduct.  Docket No. 21 ¶ 1, 107, 115.  Specifically, Hernandez claims that the "widespread practices" that contributed to the misconduct "were allowed to flourish because the leaders, supervisors, and policymakers of Defendant City of Springfield directly encouraged and were the moving force behind the type of misconduct at issue" in his complaint.  Id. ¶ 112.

The parties have, among other things, exchanged interrogatories and document requests and their corresponding answers.  Docket No. 92 ¶ 2.  This discovery includes documents involving SPD policies and practices.  Id. ¶ 3.  Hernandez has deposed two former SPD commissioners and several current and former SPD officers about their involvement in Rodriguez's murder and the policies and practices of the SPD.  Docket No. 92 ¶¶ 4-5.  After beginning a Rule 30(b)(6) deposition of the City regarding, among other topics, SPD policies and

2

practices, the parties jointly agreed to suspend the deposition in favor of Hernandez serving additional interrogatories for the information sought.  Id. ¶¶ 6-7.

Mayor Sarno has served as the City's mayor since 2008.  Docket No. 93 ¶ 1.  He attests that he is not involved in the daily operations of the SPD, does not establish SPD policies and procedures, and possesses no personal knowledge regarding the investigation of Rodriguez's murder or Hernandez's subsequent prosecution and conviction.  Id. ¶¶ 4, 6-8.  Nonetheless, on July 6, 2008, and February 23, 2010, the Mayor issued executive orders creating the Community Complaint Review Board ("CCRB") and the Community Police Hearing Board ("CPHB"), respectively.  Docket No. 91 at 5 n.1.

The CCRB was a public body tasked with reviewing civilian complaints against police officers.  Docket No. 96-2 at 4-6.  It was a Mayor-created board.  Id. at 2.  The CPHB was created to replace the ineffective CCRB.  Docket No. 96-3 at 2-3.  It was designed to increase police accountability while assuring professional management of the SPD.  Id. at 4.  The Mayor concedes that he "may retain some control over matters ancillary to [the SPD]" through the creation of these boards, which were tasked with reviewing civilian complaints against SPD officers.  Docket No. 91 at 5 n.1.  Further, Massachusetts General Laws c. 43, §§ 52-54 grant the mayor the sole power to appoint and remove heads of departments and members of municipal boards, including police commissioners.  See M.G.L. c. 43, §§ 52-54.  Former Police Commissioner William Fitchet[2] also testified that he had a habit of notifying Mayor Sarno about murders in the City and "grievous complaint[s]" against police officers.  Docket No. 107-4 at

---

[2] The CCRB, of which Mayor Sarno was a member, approved Fitchet's appointment as commissioner prior to Mayor Sarno hiring him.  Docket No. 107-4 at 3 (20:23-21:24).

3(19:2-5; 20:14-17).  Fitchet, however, has no recollection of discussing specifically the Rodriguez murder with Mayor Sarno.  Id. at 3(20:9-12).

On September 18, 2025, Mayor Sarno, who answered Hernandez's first set of interrogatories on behalf of the City, was subpoenaed to testify at a deposition.  Docket No. 92 ¶ 8.  See Docket No. 96-8 at 15.  On November 11, 2025, Mayor Sarno filed a motion to quash the subpoena and a motion for a protective order.  Docket No. 90.  Hernandez filed an opposition, and the parties filed their respective reply and sur-reply briefs thereafter.  Docket Nos. 95, 106, 111.  This Court held a hearing on April 16, 2026.  Docket No. 129.

II.    Legal Standard

"Discovery procedures set forth in the Federal Rules of Civil Procedure seek to further the interests of justice by minimizing surprise at trial and ensuring wide-ranging discovery of information."  Cartel Asset Mgmt. v. Ocwen Fin. Corp., No. 01-cv-01644-REB-CBS, 2010 WL 502721, at *9 (D. Colo. Feb. 8, 2010) (citing United States ex rel. Schwartz v. TRW, Inc., 211 F.R.D. 388, 392 (C.D. Cal. 2002)).  To that end, Rule 26(b) permits "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  A Rule 45 subpoena is subject to Rule 26(b)'s restrictions.  Miller v. Allstate Fire & Cas. Ins. Co., No. 07-260, 2009 WL 700142, at *2 (W.D. Pa. Mar. 17, 2009) (citation omitted).  Thus, the information sought by a Rule 45 subpoena must be: (1) not privileged; (2) relevant to the claim or defense of any party; and (3) proportional to the needs of the case.  Fed. R. Civ. P. 26(b)(1).  "A subpoena issued to a non-party pursuant to Rule 45 is subject to Rule 26(b)'s overriding relevance requirement."  EEOC v. Texas Roadhouse, Inc., 303 F.R.D. 1, 2 (D. Mass. 2014).  The burden of establishing the relevance of

the requested information is on the subpoenaing party.  Viscito v. Nat'l Plan. Corp., No. CV 3:18-30132-MGM, 2020 WL 4274721, at *2 (D. Mass. July 24, 2020).

Rule 26(c)(1) provides that "[a] party or any person from whom discovery is sought may move for a protective order in the court where the action is pending ....  The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense ...." Fed. R. Civ. P. 26(c)(1).  Rule 26 "confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required."  Seattle Times Co v. Rhinehart, 467 U.S. 20, 36 (1984).

III.    Discussion

In his complaint, Hernandez alleges his injuries were caused by the official policies, practices, and policymaking actions of the City and the SPD under 42 U.S.C. § 1983.  Docket No. 21 ¶ 107.  In Monell v. Department of Social Services of New York, 436 U.S. 658, 690-91 (1978), the Supreme Court held that municipalities may be liable when a plaintiff is injured by an action pursuant to a municipality's policy or custom.  Under Monell and subsequent cases, a plaintiff seeking to prove municipal liability under Section 1983 must identify a municipal policy or custom that caused the plaintiff's injury.  Id. at 694; City of Oklahoma City v. Tuttle, 471 U.S. 808, 818 (1985); Young v. City of Providence, 404 F.3d 4, 25 (1st Cir. 2005).  "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality."  Board of the County of Comm'rs of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 403-04 (1997).  "Similarly, an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly

subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." Id. at 404.

Monell liability attaches where "the need for more or different training is so obvious . . . that policymakers of the city can reasonably be said to have been deliberately indifferent to the need." See Vincent v. Dolan, 755 F. Supp. 3d 158, 168 (D.R.I. 2024). "To show discovery is relevant to a Monell claim, the information sought must relate to the city's alleged policy or custom that has caused the plaintiff harm." Agyeah v. City of Worcester, No. 4:21-CV-40020-MRG, 2023 WL 6961885, at *3 (D. Mass. Oct. 20, 2023). Neither the volume of document discovery nor a party's own interpretation of those records undermines a plaintiff's showing that a specific individual's deposition is nonetheless necessary. See BFI Waste Sys. of New Jersey, Inc. v. Township of Monroe, Civil Action No. 23-0059 (RK) (JTQ), 2025 WL 295848, at *6 (D.N.J. Jan. 24, 2025).

The parties agree that the standard set out in Bogan v. City of Boston, 489 F.3d 417 (1st Cir. 2007), governing whether one may depose high ranking government officials applies in this case. Docket Nos. 91 at 6; 95 at 5. In Bogan, the First Circuit recognized that because "[h]igh ranking government officials have greater duties and time constraints than other witnesses," the practice of deposing them "should be discouraged." Bogan, 489 F.3d at 423 (quoting In re U.S., 985 F.2d 510, 512 (11th Cir. 1993)). However, "this limitation is not absolute." Id. Where the high-ranking official has "first-hand knowledge related to the claim being litigated," a deposition may be permitted "only where it is shown that other persons cannot provide the necessary information." Id.

6

The first question,[3] then, is whether Mayor Sarno has firsthand knowledge related to Hernandez's claims.  Bogan, 489 F.3d at 423.  Mayor Sarno's argument that he has no knowledge of the SPD investigation into the Rodriguez murder or the prosecution of Hernandez and did not set the policies and procedures governing the day-to-day operations of the SPD misses the point.  Indeed, Hernandez does not seek to depose the Mayor on these topics.  Docket No. 95 at 9.  He seeks to depose Mayor Sarno regarding the circumstances surrounding his creation of the oversight boards, his knowledge and awareness of SPD misconduct during the relevant time period, his response to such misconduct, and his responsibilities with respect to overseeing the actions of the Police Commissioner.  Id. at 7, 9.  Mayor Sarno has not attested to a lack of knowledge in any of these areas.

In fact, the record suggests that Mayor Sarno may well possess first-hand knowledge relevant to Hernandez's Monell claims.  Former Commissioner Fitchet's deposition testimony revealed that he "talked with [Mayor Sarno] pretty frequently" about issues that were "unusual or important" and that he would notify the Mayor about murders or "a particularly grievous complaint against a police officer."  Docket. No. 107-4 at 3.  Fitchet would also submit to Mayor Sarno, at his request, "any report he wanted or anything he was interested in."  Id. at 4.  Further, not only did the Mayor create the 2008 CCRB, he was also a member, making it likely that he would possess relevant information that came before the board during the relevant period.  Id. at 3 (page 20, lines 1-2).  Even if the Mayor did not participate fully in CCRB operations, the board reported to him.  Docket No. 96-2 at 5.  Accordingly, Hernandez has shown that Mayor Sarno likely has firsthand information relevant to Hernandez's Monell claims against the City.

---

[3] There is no dispute that Mayor Sarno qualifies as a high ranking government official for purposes of this opinion.

The second question is whether someone other than Mayor Sarno can provide the information requested by Hernandez.  <u>Bogan</u>, 489 F.3d at 423.  Mayor Sarno broadly maintains that Hernandez has already obtained all the relevant information he seeks through Fitchet's deposition, the 30(b)(6) deposition of the City, and the City's document production.  Docket No. 91 at 8.  According to the Mayor, all information regarding officer misconduct within the relevant time period is contained in the SPD internal investigation files, police commissioner briefings, and SPD disciplinary hearing records.  Docket No. 106 at 3.  This Court disagrees.

First, the City has allegedly refused to produce documents related to SPD complaints or investigations concerning, among other topics, officers pressuring or coercing witnesses, failing to accurately create or retain investigative materials, and withholding exculpatory evidence.[4] Docket No. 96-10 at 3.  Second, even if the City had produced these documents, they would not reveal the Mayor's personal knowledge regarding his discussions with Fitchet, the underlying rationale behind the creation of the 2008 and 2010 oversight boards, or his discussions with the oversight boards' members.  Because Fitchet testified that most communications with Mayor Sarno occurred in person or by telephone, Docket. No. 107-4 at 3, these exchanges regarding officer misconduct or the investigation of Rodriguez's murder may have never been documented. Further, Hernandez failed to glean any such information from Fitchet, who maintained that he had no memory of his discussions with the Mayor.  <u>Id.</u>  With these shortcomings in mind, the large volume of documents produced by the City, <u>see</u> Docket No. 91 at 2, is not dispositive.

---

[4] Although the City's 30(b)(6) witness admitted that SPD recordkeeping at the time in question "wasn't so great," the Mayor denies that the City has refused to produce information on these topics; instead, he maintains that Hernandez has had "unfettered opportunity" to obtain this information through two 30(b)(6) depositions and the depositions of former Police Commissioners.  Docket No. 106 at 3 n.1, 6-7.

Regarding the CCRB and CPHB, Mayor Sarno claims that Hernandez had, and continues to have, the opportunity to denote the creation of the oversight boards as a relevant topic in a 30(b)(6) deposition and could pose excess interrogatories on the topic. Docket No. 106 at 3 n.1, 7. Although the Mayor has suggested that Hernandez could direct his inquiries on such topics to Monique McCoy, the City's 30(b)(6) witness, she would likely be unable to answer questions regarding the Mayor's reasons for creating and participating in the oversight boards, particularly given that he is "answerable to the voters of Springfield for the performance of the police department." City Council of Springfield v. Mayor of Springfield, 489 Mass. 184, 193 (2022).

Further, this Court is unconvinced that the need to sit for the deposition would impose an undue burden on Mayor Sarno given the particular facts of this case. Notwithstanding his undoubtedly busy schedule, "[t]here is no indication that sitting for a deposition will interfere in any way with [his] ability . . . to perform his duties as Mayor of [Springfield]." BFI Waste Systems of New Jersey, Inc., 2025 WL 295848, at *6. Recently, in Stevenson v. City of Newark, Civil Action No. 20-18722-EP-AME, 2024 WL 1526102 (D.N.J. Apr. 9, 2024), the court permitted a 2.5-hour deposition of the mayor of the largest city in New Jersey to proceed where the record did "not place him so far out on the periphery of events that the Court c[ould] confidently conclude there [wa]s no need for his deposition." Id. at *9. The same can be said here. Mayor Sarno's argument that this decision runs the risk of opening the floodgates of litigants seeking to depose is unpersuasive as future litigants will still be required to make the same fact-specific showing Hernandez has met here.[5] Accordingly, Mayor Sarno's motion to quash is denied.

---

[5] Notably, the City itself increased the risk that the Mayor's testimony is warranted by electing to have him sign the interrogatories. See Vesper Mar. Ltd. v. Lyman Morse Boatbuilding, Inc., No. 2:19-CV-00056-NT, 2020 WL 877808, at *5 (D. Me. Feb. 21, 2020) (denying motion to quash

Finally, in asking the court to issue a protective order, Mayor Sarno argues that the deposition subpoena is intended to "annoy, harass, embarrass, and impose undue burden" on him.  Docket No. 91 at 10-11.  This Court finds no evidence of such an improper motive.  Rather, as established above, Hernandez seeks relevant information that is not available through other discovery channels.  Accordingly, the motion for a protective order is denied.

IV.    Conclusion

For the foregoing reasons, Mayor Sarno's motion to quash and for a protective order is denied based on the particular circumstances of this case.  Hernandez may depose Mayor Sarno for up to three hours at a date and time convenient to the Mayor within thirty days of this Order.

So ordered.

        / s / Jennifer C. Boal
JENNIFER C. BOAL
UNITED STATES MAGISTRATE JUDGE

---

subpoena where witness demonstrated sufficient involvement in underlying case and personally signed interrogatory responses).